IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | | |
|---|---|---|
| LOREN MARTIN | ) | Civil No. 08-763-JE |
| | ) | |
| Plaintiff, | ) | FINDINGS AND |
| | ) | RECOMMENDATION |
| v. | ) | |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

Tim Wilborn
P.O. Box 2768
Oregon City, OR 97045

Attorney for Plaintiff

Karin J. Immergut
U.S. Attorney
Adrian L. Brown
Asst. U.S. Attorney
1000 S.W. 3rd Ave., Suite 600
Portland, OR 97204-2902

FINDINGS AND RECOMMENDATION - 1

David M. Blume
Special Asst. U.S. Attorney
Social Security Administration
Office of the General Counsel
701 5th Avenue, Suite 2900 M/S 901
Seattle, WA 98104-7075

  Attorneys for Defendant

JELDERKS, Magistrate Judge:

  Plaintiff Loren Martin brings this action pursuant to 42 U.S.C. § 405(g) seeking judicial review of a final decision of the Commissioner of Social Security (the Commissioner) denying his applications for Social Security Disability Insurance Benefits (DIB) and Supplemental Security Income benefits (SSI).  For the reasons set out below, the Commissioner's decision should be reversed, and this action should be remanded for an award of benefits.


<u>Procedural Background</u>

  Plaintiff filed applications for DIB and SSI on October 3, 2001.  After these applications were denied initially and upon reconsideration, plaintiff timely requested a hearing before an Administrative Law Judge (ALJ).

  Following hearings held on April 29, 2004, and September 27, 2004, ALJ Riley Atkins issued a decision on January 27, 2005, finding that plaintiff was not disabled within the meaning of the Social Security Act (the Act).  That decision became the final decision of the Commissioner on October 22, 2005, when the Appeals Council denied plaintiff's request for review.

FINDINGS AND RECOMMENDATION - 2

Plaintiff brought an action in this court challenging denial of his applications for benefits. Martin v. Commissioner of Social Security, CV 05-1913-HO (D. OR. 2005). In an Order entered on January 27, 2007, the District Court remanded the action for further proceedings. The Court noted that the ALJ had failed to address Dr. Shellman's conclusion that plaintiff met the criteria for general assistance based on psychological factors, had a global assessment of functioning of 45, had "marked" impairment in activities of daily living, had experienced more than four episodes of decompensation during the previous 12 month period, had "an active disease process that has produced quite marginal adjustment," had moderate impairment in attention/concentration operations, and would experience further decompensation if mental demands were increased. The Court also noted that the ALJ had not addressed a report prepared by Dr. Wimmers. Id., slip op. at 2. (D. OR. Jan. 27, 2007).

On March 2, 2007, the Appeals Council issued an order remanding the action for a new hearing. ALJ Atkins held a hearing on November 14, 2007, and issued a decision on December 10, 2007, again finding that plaintiff was not disabled within the meaning of the Act. That decision became the final decision of the Commissioner on April 25, 2008, when the Appeals Council denied plaintiff's request for review. In the present action, plaintiff challenges that decision.

Factual Background

Plaintiff was born in October, 1964. He was 33 years old in March, 1998, the alleged date of the onset of his disability, and was 43 years old in December, 2007, when the ALJ issued his most recent decision finding that he was not disabled.

FINDINGS AND RECOMMENDATION - 3

Plaintiff attended special education classes in elementary school, and earned an associate's degree in criminal justice from a community college after receiving substantial educational accommodation.  He has past relevant work experience as a production inspector and as a detoxification counselor.  Plaintiff worked part-time as a production inspector in 1997 and 1998, and worked part-time, on an on-call basis, at a youth detention center in 2004 and 2005.  Plaintiff testified that his employment at the detention center ended because his depression prevented him from responding to calls to work because of his depression.

Disability Analysis

The ALJ engages in a five-step sequential inquiry to determine whether a claimant is disabled within the meaning of the Act.  20 C.F.R. §§ 404.1520, 416.920.  Below is a summary of the five steps, which also are described in Tackett v. Apfel, 180 F.3d 1094, 1098-99 (9th Cir. 1999).

Step One.  The Commissioner determines whether the claimant is engaged in substantial gainful activity (SGA).  A claimant engaged in such activity is not disabled.  If the claimant is not engaged in substantial gainful activity, the Commissioner proceeds to evaluate the claimant's case under Step Two.  20 C.F.R. § 404.1520(b).

Step Two.  The Commissioner determines whether the claimant has one or more severe impairments.  A claimant who does not have such an impairment is not disabled.  If the claimant has a severe impairment, the Commissioner proceeds to evaluate claimant's case under Step Three.  20 C.F.R. § 404.1520(c).

Step Three.  Disability cannot be based solely on a severe impairment; therefore, the Commissioner next determines whether the claimant's impairment "meets or equals" one of

the impairments listed in the SSA regulations, 20 C.F.R. Part 404, Subpart P, Appendix 1. A claimant who has such an impairment is disabled. If the claimant's impairment does not meet or equal one listed in the regulations, the Commissioner's evaluation of the claimant's case proceeds under Step Four. 20 C.F.R. § 404.1520(d).

Step Four. The Commissioner determines whether the claimant is able to perform work he or she has done in the past. A claimant who can perform past relevant work is not disabled. If the claimant demonstrates he or she cannot do work performed in the past, the Commissioner's evaluation of the claimant's case proceeds under Step Five. 20 C.F.R. § 404.1520(e).

Step Five. The Commissioner determines whether the claimant is able to do any other work. A claimant who cannot perform other work is disabled. If the Commissioner finds that the claimant is able to do other work, the Commissioner must show that a significant number of jobs exist in the national economy that the claimant can do. The Commissioner may satisfy this burden through the testimony of a vocational expert (VE) or by reference to the Medical-Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, Appendix 2. If the Commissioner demonstrates that a significant number of jobs exist in the national economy that the claimant can do, the claimant is not disabled. If the Commissioner does not meet this burden, the claimant is disabled. 20 C.F.R. § 404.1520(f)(1).

At Steps One through Four, the burden of proof is on the claimant. Tackett, 180 F.3d at 1098. At Step Five, the burden shifts to the Commissioner to show that the claimant can perform jobs that exist in significant numbers in the national economy. Id.

Medical Record

FINDINGS AND RECOMMENDATION - 5

Based upon an evaluation performed on December 20, 1999, Shane Haydon, Ph.D., opined that plaintiff had significant learning disabilities, Attention Deficit Disorder depression, and a GAF of 50.[1]  Dr. Haydon concluded that plaintiff had produced a valid profile on the MMPI-2 test he administered, indicating "open acknowledgment of psychological distress."

Richard Mead, Ph.D, M.D., treated plaintiff from October, 1999, through December, 2001.  Dr. Mead noted that plaintiff had a history of Bipolar Disorder, dysthymia, and dyslexia, and reported that plaintiff was tearful, agitated, and apprehensive.  Dr. Mead treated plaintiff a number of times for symptoms associated with these disorders, including anxiety, angry outbursts, social isolation, binge eating, depression and suicidal ideation, panic attacks, stress, and difficulty concentrating.  In a letter dated August 30, 2001, Dr. Mead stated that plaintiff was diagnosed with Bipolar Disorder-Mixed.  Dr. Mead stated that plaintiff had been treated with antidepressants, mood stabilizers and hypno-sedatives.  He indicated that plaintiff was expected to "have this condition lifelong," and that "his status will wax and wane as to intensity and symptomatologies."  Dr. Mead stated that plaintiff was compliant, and that his prognosis was "guarded as [he] appears to exacerbate when under personal stress."  In another letter dated January 15, 2002, Dr. Mead opined that plaintiff did not have "functional limitations imposed by impairments hindering his ability to do work related mental activities such as understanding and memory; sustained concentration and persistence; social interaction, and adaptability."  He noted that plaintiff was taking

---

[1]According to the Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition Text Revision (2000)(DSM-IV-TR), a GAF score of 50 indicates "serious impairment" such as the inability to keep a job.

medication, and that, though he was stable at that time, his stability fluctuated.  Dr. Mead

added that plaintiff was "attending college and maintaining a good GPA."[2]

H.F. Shellman, Ph.D., a clinical and neuropsychologist, evaluated plaintiff

in October, 2001.  Dr. Shellman diagnosed plaintiff with Bipolar Disorder,

Attention Deficit/Hyperactivity Disorder, Reading Disorder, Disorder of Written Expression,

Alcohol Dependence in sustained full remission, and Cannabis Dependence, also in sustained

full remission.  He also diagnosed plaintiff with Borderline Personality Disorder, and rated

his then current GAF at 45.  In the narrative portion of his report, Dr. Shellman opined that

plaintiff had "marked" impairment in his activities of daily living, and opined that plaintiff

had experienced more than four episodes of decompensation during the previous year.  He

added that, even if the symptoms of plaintiff's bipolar disorder were "brought under control

by psychotropic medications," he would continue to have "problems in functioning" because

his personality disorder exacerbated his disorder.  Dr. Shellman opined that plaintiff

produced a valid PAI profile "without any evidence of attempts at either positive or negative

impression management."  He stated that plaintiff's profile suggested that he would be prone

to rapid, extreme mood swings, poor anger control, impulsiveness, and self-destructive

behavior, and observed that plaintiff had "significant problems" that were frequently

associated with manic episodes.

---

[2]This assessment appears to overstate plaintiff's success in college.  As discussed below, plaintiff received significant accommodation at the Community College he attended, required far more than the average time to complete the required courses, and had difficulty maintaining regular attendance.

Throughout 2001 and 2002, Dr. Lori Rumbaugh, plaintiff's primary care physician, treated plaintiff for elbow pain, right ankle pain, obesity, and back pain. Dr. Rumbaugh noted that plaintiff was morbidly obese and had Bipolar Disorder.

A nurse practitioner at Lutheran Community Services evaluated plaintiff on October 9, 2002. The clinician reported that plaintiff was functioning at a distressed level, with feelings of depression and suicidal ideation. Major Depressive Disorder was diagnosed, and plaintiff's GAF was rated at 51.

Following a psychiatric consultation on November 19, 2002, Dr. J. Teresa Shelby noted that plaintiff had stopped seeing Dr. Mead because of a change in insurance. Dr. Shelby noted that plaintiff was obese, depressed, reported having frequent "low level suicidal thoughts," and was near tears. She opined that plaintiff was in a depressive phase of Bipolar Disorder and needed to be treated for depression "semi-urgently." Dr. Shelby also opined that plaintiff was at risk of hospitalization if his depression worsened, and rated his GAF at 40, a level indicating an inability to work. Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition, Text Revision (2000)(DSM-IV), page 34.

A discharge summary prepared by a clinician at Lutheran Community Services on April 8, 2003 stated that plaintiff was leaving because of a change in his insurance benefits, and was being referred to Yamhill County Mental Health for medication management. Upon discharge, plaintiff continued to be diagnosed with Bipolar Disorder, and his GAF was rated at 45.

J.B. Arnold, M.D., a consulting psychiatrist, conducted a comprehensive psychiatric assessment of plaintiff when plaintiff enrolled in Yamhill County Mental Health in April, 2003. Dr. Arnold listed plaintiff's diagnoses as Bipolar Disorder; Major Depression,

FINDINGS AND RECOMMENDATION - 8

(recurrent); Alcohol Abuse, remission; and Drug abuse, Sedatives and Cannabis, remission. Plaintiff's then-current GAF was rated at 50.

Dr. Arnold treated plaintiff with a number of medications, including Wellbutrin XL, Trazodone, and Zyprexa. In a progress note dated February 18, 2004, Dr. Arnold noted that, though they were under control at that time, plaintiff's episodic depressive symptoms continued. He added that the embarrassment and direct consequences of plaintiff's hypomanic episodes could also be "significant." Dr. Arnold also noted that, near the end of such episodes, plaintiff became irritable and paranoid, and would accuse others of "doing things they are in fact not doing, i.e. talking about him."

At the request of the Social Security Administration, plaintiff was evaluated by Dale Veith, Psy.D., a clinical psychologist, on June 14, 2004. Dr. Veith reported plaintiff's history of learning disabilities, drug and alcohol abuse, and suicide attempts, and noted that the information plaintiff provided was consistent with the information in the medical records he had reviewed. He noted that plaintiff had struggled to complete a community college program even with the accommodations provided by disability services, and that plaintiff had missed school often because of depressive periods during which he did not leave the house. Dr. Veith opined that the results of plaintiff's MMPI-2 test were valid, and reported that those tests suggested that plaintiff had many psychological problems. Dr. Veith reported that individuals with similar profiles tended "to show a pattern of chronic psychological maladjustment," noted that plaintiff appeared to be "impulsive, immature, angry, and hostile," and opined that plaintiff "may have a history of overly aggressive behavior." He added that plaintiff's "poor work and achievement record" complicated those problems, and that plaintiff tended to "lose control easily." Dr. Veith reported that plaintiff's test responses

FINDINGS AND RECOMMENDATION - 9

suggested that plaintiff was "losing control of his thought processes," and suggested that plaintiff had seriously contemplated suicide, had difficulty relating to others, tended to have conflicts over rules and authority, had anger management problems, and would likely be resistant to treatment.

Dr. Veith opined that plaintiff had mild difficulties maintaining adequate social functioning and minimal difficulties with persistence, pace, and concentration, but that his negative work attitudes could limit his adaptability in the workplace, and that his low morale and lack of interest in work could impair his adjustment to employment. He also opined that, because of his personality disorder, plaintiff would have mild problems with episodes of deterioration or decompensation in work-like settings.

Dr. Veith listed plaintiff's diagnoses as including Major depression, recurrent, moderate; Alcohol dependence, in full sustained remission; Marijuana dependence, in full sustained remission; Personality disorder, NOS with passive, dependent, and antisocial features; Obesity, and complaints of chronic ankle, knee, and back pain. He rated plaintiff's then current GAF as 55-60.

On June 21, 2004, Dr. Arnold noted that plaintiff had been experiencing hypomanic symptoms with insomnia for the previous two weeks, and that he had tremors in his lower extremities. Dr. Arnold instructed plaintiff to contact the clinic if his problems worsened before his next scheduled visit, and rated plaintiff's then current GAF at 50.

In a chart note dated October 18, 2004, Dr. Arnold noted that plaintiff had told him that he was applying "for Social Security Disability," and said that his attorney wanted to know if Dr. Arnold "supported that," and wanted to know whether he could call him to "get information." Dr. Arnold noted that he had indicated that he "had no objection to his

FINDINGS AND RECOMMENDATION - 10

applying for Social Security Disability and would be happy to send records to his attorney" if the appropriate release of information forms were signed. Dr. Arnold increased plaintiff's dosage of Wellbutrin, and again rated plaintiff's then current GAF at 50.

In a chart noted dated October 5, 2005, Dr. Arnold noted that plaintiff's depression "tends to predominate in severity and frequency" over his periods of mania. Dr. Arnold reported that, over the years, plaintiff had taken Wellbutrin, Trazodone, Zyprexa, Depakote, Lithium, Neurontin, Prozac, Serzone, and Effexor, but that he did not tolerate Depakote, Lithium, and Effexor. On November 17, 2005, he noted that plaintiff continued to be depressed and tearful, and that he and plaintiff could not agree on changes to plaintiff's medications. Plaintiff had stopped taking Lexapro, which had been prescribed, because of "sexual side effects," and continued to take a combination of Wellbutrin, Trazodone, and Zyprexa. Plaintiff's GAF was again rated at 50.

Plaintiff's mother, who also has Bipolar Disorder, accompanied plaintiff on his visit to Dr. Arnold on January 24, 2006. Dr. Arnold noted that plaintiff appeared to be depressed, and that both he and his mother asked that he be put on mood stabilizers. In progress notes from visits in March, June, and September, 2006, Dr. Arnold noted that plaintiff had become hostile about his medications, and requested a change in physicians. Dr. Arnold, who continued to rate plaintiff's then current GAF at 50, approved that request.

In a progress note dated September 11, 2006, Psychiatric Nurse Practitioner Karen Peters noted that plaintiff continued to experience depression, and that he could be "very needy and impatient" when he was depressed. In the notes of a visit on September 16, 2006, Peters reported that plaintiff was "quite distressed" and tearful. Plaintiff admitted that he sometimes did not take prescribed medications during hypomanic episodes because those

FINDINGS AND RECOMMENDATION - 11

episodes were "very pleasurable."  Plaintiff was in a "depressed phase," and his mood swings

tended to occur every 3 or 4 days.

In the progress notes of a visit on February 26, 2007, Peters reported that plaintiff

was having compliance issues regarding his medications, and that he had "issues around

anxiety and hording [sic] junk."  Plaintiff told her that it was "difficult to navigate through

his apartment due to the piles of stuff," and was concerned because he was to have a housing

inspection in the near future.  Plaintiff was tearful and acknowledged "difficulties with

anxiety, panic, and being unable to let go of physical items."  In the notes of a visit on

April 9, 2007, Peters indicated that plaintiff reported "being very depressed and

overwhelmed."  Plaintiff reported having difficulty raising his 14-year-old son, and

acknowledged that he had not been compliant with medications.  Plaintiff was disheveled

and tearful, and acknowledged difficulty with "motivation and follow through."  Peters stated

that, although he had a "pill minder," plaintiff was "unable to manage compliance with

medications."  In her record of plaintiff's visit on June 18, 2007, Peters noted that plaintiff

had not been compliant with this medication regime, and that he said he had missed his last

appointment because of episodes of severe depression.

Dr. Veith, who had evaluated plaintiff in 2004, again evaluated plaintiff at the request

of the Social Security Administration on June 30, 2007.  Dr. Veith noted that, since he had

last evaluated him, plaintiff had worked about one day a week on an on-call basis for the

Yamhill County Detention Center, but had been terminated because he declined offers of

work because of depressive episodes.  Plaintiff told Dr. Veith that his son was living with

him, and that their relationship was increasingly difficult, and that his depression interfered

with his ability to care for his son.  Plaintiff also told him that he had relapsed, and began

using alcohol again for several months since the time of his previous evaluation, but that he had since been sober for approximately 18 months.  Plaintiff said that he had relapsed because of the pain he experienced following back surgery.  He told Dr. Veith that he was six feet tall and weighed approximately 375 pounds.

Dr. Veith opined that the results of validity testing that he performed as part of the assessment were "positive for malingering."  He added that, "[b]ecause it is well documented that examinees 'pick and choose' when to give good effort, and when to feign problems, it is impossible to interpret the examinee's test results.  Therefore, when an examinee's scores on measures of malingering are positive, the assessment results should be deemed invalid and they should not be used when making clinical or administrative decisions."  He added that, because plaintiff "scored in the positive direction on several measures of malingering," he would not interpret plaintiff's scores.  Dr. Veith further opined that plaintiff's MMPI-2 testing produced a valid profile.  However, he opined that tests such as the "Fake Bad" scale suggested malingering and exaggeration.  Dr. Veith concluded that plaintiff would be independent in activities of daily living, and would have only mild problems with social interaction, concentration, persistence, and pace.  He noted that plaintiff reported experiencing several episodes of deterioration in work-like settings during the previous year, but considered plaintiff's report regarding his functioning as unreliable "as there is evidence that he is exaggerating the severity of his psychological, somatic, and cognitive problems."  Except for the addition of a diagnosis of "malingering probable," Dr. Veith's diagnoses were consistent with his 2004 evaluation.

Because his assessment of "malingering probable" was significant, plaintiff's former counsel asked that Dr. Veith produce the underlying test data that purportedly supported that

conclusion.  A legal assistant to the Portland, Oregon Social Security Hearings Office informed counsel that Dr. Veith had destroyed his notes after writing his report.  Counsel responded that this was "completely irresponsible," and complained of this practice to the ALJ who conducted plaintiff's hearings and concluded that plaintiff was not disabled. Counsel asserted that, because the underlying test data had been destroyed, Dr. Veith's method in reaching "this ugliest of possible conclusions cannot now be reviewed."[3]

Following Dr. Veith's assessment of probable malingering, plaintiff's former counsel referred plaintiff to James Powell, Psy.D, for another evaluation.  Based upon an evaluation completed on October 17, 2007, and upon a review of plaintiff's medical records, Dr. Powell opined that plaintiff had Bipolar Disorder characterized by several of the depressive and manic symptoms specified in Listing 12.04, and that these symptoms resulted in marked impairment in plaintiff's social functioning and marked restrictions in plaintiff's activities of daily living.  He opined that plaintiff's "episodes of depression and associated functional limitations would likely interfere with his ability to maintain employment for an extended period of time."  Dr. Powell opined that plaintiff's bipolar mood disorder was evidenced by depressive symptoms, including anhedonia, appetite disturbance, sleep disturbance, decreased energy, feelings of guilt or worthlessness, difficulty concentrating or thinking, and thoughts of suicide and manic syndrome characterized by hyperactivity, decreased need for sleep, distractibility, and involvement in high risk activities. He rated plaintiff's then current GAF at 44.

---

[3]Destruction of the underlying test data violated OAR 858-010-0060, which requires psychologists who render services to a third party payer, such as the Social Security Administration, to maintain "test results or other evaluative results obtained and any basic test data from which they are derived" for at least seven years.

In reaching his conclusions, Dr. Powell opined that plaintiff "was not engaging in any malingering-type behavior patterns during this evaluation.  He appeared to present himself in an authentic and forthright manner.  His emotional responses during the evaluation also appeared to be appropriate and authentic."  Dr. Powell stated that, in the review of plaintiff's medical record, "only in the psychological evaluation conducted by Dr. Veith in 2007 was there any suggestion that Mr. Martin was engaging in any type of malingering behavior, and upon review of his report, it appears that this opinion was based largely upon a formula that is currently not commonly used as a standard validity indicator in interpreting MMPI-2 results, and in Dr. Veith's report, he indicated that current standard MMPI-2 validity indicators suggested a valid profile in both evaluations that he conducted."  Dr. Powell added that Dr. Haydon had reported valid MMPI-2 results based on testing of plaintiff in 1999, and that Dr. Shellman had reported obtaining a valid profile on the PAI administered to plaintiff in 2001.

Dr. Powell's assessment, if accepted, is sufficient to support the conclusion that plaintiff's mental impairment meets Listing 12.04, Affective Disorders.  That Listing applies to affective disorders which are "characterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome."  20 C.F.R. § 404, Subpart P, Appendix 1, Listing 12.04.

In a letter dated October 29, 2007, Psychiatric Nurse Practitioner Karen Peters noted that plaintiff had been her patient since September 11, 2006.  Peters stated that plaintiff's symptoms included mood swings, which were primarily depressed, but also included experienced manic episodes each month.  Peters opined that, during plaintiff's depressed

phases, he was "impaired in his ability to participate in activities most every day." She further opined that plaintiff

> would be unable to manage employment due to his diminished ability to concentrate or indecisiveness. He has low energy and poor motivation. His less frequent manic phases cause him to have poor judgment and act impulsively. His symptoms occur daily and cause impairment in relationships, socialization and with medication compliance. His symptoms are not due to the use of drugs, alcohol or related to a medical issue, and in my opinion are not malingering. I feel he would not be able to maintain full-time employment in a competitive setting.

Lay Witness Testimony

1. Testimony of Plaintiff's Parents

Plaintiff's parents submitted written statements describing their observations of plaintiff's behavior and impairments. In a letter dated April 26, 2004, Georgia Martin, plaintiff's mother, said that plaintiff had dyslexia, hyperactivity, and learning disabilities, and had received special education services in school. She added that plaintiff had deep depression, and was hyperactive when he was manic. Ms. Martin stated that plaintiff's illnesses caused him to be absent from work and school frequently. At the bottom of Ms. Martin's letter, Dr. James Martin, a psychiatrist, added that he "would strongly concur" with Ms. Martin's statements. He also signed the letter.

Plaintiff's parents submitted a second letter, dated November 12, 2007. In that letter, plaintiff's parents stated that plaintiff continued to have depressive periods, during which he isolated himself, had suicidal ideation, and had difficulty with housework, cooking, paying bills, and performing other activities of daily living. They noted that plaintiff was irresponsible during manic periods, and that they were currently caring for his 14-year-old son.

2. Testimony of Alan Talbot

Alan Talbot, plaintiff's friend, completed an 11-page "Third Party Information on Activities of Daily Living and Socialization" form describing his observations of plaintiff's condition and behavior. Talbot reported that plaintiff did not participate in social activities, and that he did not have visitors because of his dirty house and depression. Talbot reported that plaintiff wanted to die sometimes, that he had trouble sleeping, and that he had trouble relating to store clerks, doctors and nurses, social workers and counselors, and neighbors. He reported that plaintiff had gained 100 pounds because he ate too much, that he needed to be reminded to perform basic hygiene tasks when he was depressed, and that he could not perform household chores without assistance. Talbot also reported that plaintiff needed to be reminded to pay bills, and that he was not able to handle money responsibly. He indicated that plaintiff's behavior would interfere with his ability to work on a regular basis, and wrote "call me" in the space provided for explanation of that response.

3. Testimony of Plaintiff's Vocational Rehabilitation Counselor

Molly Joubert, an Oregon Department of Human Services rehabilitation counselor, wrote plaintiff's former counsel a letter dated April 23, 2004, concerning plaintiff. Ms. Joubert reported that plaintiff had been a client of the agency since November, 1998, and had been her client since August, 2003. She reported that her work with plaintiff, and that of his past counselors, clearly indicated that there was "serious doubt to his employability." Ms. Joubert stated that plaintiff experienced "bad days" that were "completely debilitating," on which he "would not be able to attend to the demands of any job . . . ." She added that,

FINDINGS AND RECOMMENDATION - 17

during the previous 9 months, she had observed that plaintiff had had more bad days than good days.

Ms. Joubert opined that plaintiff was credible, and stated that she did "not see any signs of malingering or exaggerating his issues and symptoms."  She stated that plaintiff had made great efforts to improve his mental health, but that "even with all this effort he continues to struggle and has long bouts of depression that appear to last anywhere from weeks to months."  Ms. Joubert added that, during times of depression, plaintiff was "extremely tearful," lacked focus, was scattered in his thinking, and lost motivation.

In a second letter dated January 6, 2005, Ms. Joubert noted that plaintiff was no longer asked to work at a juvenile corrections facility because he had missed or turned down 11 of the 45 shifts offered to him during a 10-month period.  She opined that plaintiff's "continued absences from school and work indicate that he is not competitive over time in even a part time basis," and consequently could not benefit from the services of the vocational rehabilitation program.


4. Judy Joslin, Accommodations Assistant with Chemeketa Community College Disability Services

In a letter dated April 26, 2004, Ms. Joslin stated that, during the years that he had attended Chemeketa Community College, plaintiff was overwhelmed when he entered the depressive phase of his bipolar disorder.  Ms. Joslin opined that plaintiff had been "an honest student who has tried his best," and reported that his disability made his studies "extremely difficult at times."  She attached records showing that plaintiff had been provided extensive accommodations while enrolled in the Community College, including being allowed time

and a half for testing, and being provided a reader and scribe for his tests, a note-taker for some classes, and extra time to complete assignments.

<u>Plaintiff's Testimony</u>

1. <u>April 29, 2004 Hearing</u>

At the hearing held on April 29, 2004, plaintiff testified that he has dyslexia and attention deficit disorder, and that, beginning in the fifth grade, he received special education services.  He testified that he read slowly, and that, when he worked as a drug and alcohol rehabilitation counselor, he handwrote his reports, which the clerical staff would then type and correct.  Plaintiff stated that he had conflicts with coworkers and his immediate supervisor during manic phases while working in that position, and that he was terminated for missing work too often.

Plaintiff attempted vocational rehabilitation after losing another job after he was placed on leave during a depressive phase when he was unable to stop crying, and was unable to keep up with the required production level after returning to work.  He reported that he was encouraged to attend a community college, where he needed approximately 15 academic quarters to earn a degree that normally required 6 terms.  Plaintiff stated that he was able to complete the course work only because he was provided accommodations, including books on tape, extra time to take tests, testing in quiet locations, assistance in understanding test questions, the assistance of volunteer note takers in class, and extra time provided to complete assignments.

Plaintiff stated that the depressive phases of his bipolar disorder were particularly hard on him, and that the manic phases were harder on others around him.  He estimated that

FINDINGS AND RECOMMENDATION - 19

he experienced manic periods every three or four months, and that these phases usually lasted from 10 days to three weeks.  He added that he had difficulty taking his medications during manic phases because he did not want to sleep, and that he tended to become more reactive and aggressive near the end of those phases.  Plaintiff testified that he had difficulty functioning during depressive phases, which could last from a few weeks to a few months. He cited depression as the main reason that it took him so long to complete his community college program.

2. September 27, 2004 Hearing

During the supplemental hearing held on September 27, 2004, plaintiff testified that he was still in school, though he had completed his Associate of Arts degree.  Plaintiff had dropped one class and had taken an incomplete in a work-study class involving work at a Youth Detention Center where he hoped to find a job.  At the time of the hearing, plaintiff was working one 8-hour shift per week at the Youth Detention Center, where he was earning $12 per hour.

Plaintiff testified that he currently had custody of his teenage son.  He added that his parents had provided the "greatest emotional support" while he was caring for his son, and that his son had lived with them for a few weeks while plaintiff was having difficulty with depression.

3. November 14, 2007 Hearing

During the hearing held on November 14, 2007, following remand, plaintiff testified that he had lost his one-day-per-week job at the Youth Detention Center because he had

missed or turned down too many shifts during a depressive phase.  Plaintiff testified that his

teenage son helped with grocery shopping and household chores, and gave him a reason to

live.  He also testified that, since the time of the previous hearing, he had relapsed into drug

and alcohol use for several months following back surgery, but that he had regained his

sobriety, and had been sober for almost two years at the time of the November 14, 2007

hearing.  Plaintiff testified that his son was currently living with plaintiff's parents, who had

been "helping . . . a lot in that regard " while plaintiff looked for housing.  He also stated that

his son had been "acting out."


<u>Vocational Expert Testimony</u>

Kathryn  Heatherly, a VE, testified at the hearing held on September 27, 2004.  The

VE testified that plaintiff had worked as a hard drive disk or nickel inspector, which the VE

rated as light, semi-skilled work, and as a case manager or consultant in "a detoxification, or

alcohol and drug counseling environment," which was rated as skilled, sedentary work.

In his hypothetical, the ALJ asked the VE to consider an individual who was limited

to light work and who had the non-exertional limitations described in Dr. Veith's report dated

June 14, 2004.  As noted above, in that report, Dr. Veith opined that plaintiff had mild

difficulties maintaining adequate social functioning and minimal difficulties with persistence,

pace, and concentration, but that his negative work attitudes could limit his adaptability in

the workplace, and that his low morale and lack of interest in work could impair his

adjustment to employment.  Dr. Veith also opined that plaintiff would have mild problems

with episodes of deterioration or decompensation in work-like settings because of his

personality disorder.  In response, the VE testified that a person with the residual functional capacity described could perform all of plaintiff's past work.

The ALJ also asked the VE to consider the non-exertional limitations described in a DDS Residual Functional Capacity assessment dated September 9, 2002, prepared by Dr. Dick Wimmers, a psychologist.  In that RFC, plaintiff was assessed as being moderately limited in his ability to understand and remember detailed instructions, in his ability to maintain attention and concentration for extended periods, and in his ability to interact appropriately with the public.  In response, the VE testified that only plaintiff's previous inspector position would be appropriate for an individual with these limitations.

The ALJ then asked the VE to consider an individual whose non-exertional limitations allowed only routine, repetitive work with little public contact, who worked best alone, and not part of a team.  The VE testified that this would not alter her previous answer. In response to further questioning by the ALJ, the VE also testified that absences of two or more hours a week at unpredictable times would rule out all work.

Plaintiff's attorney asked the VE to consider an individual who could perform light work, and who had the non-extertional limitations described by plaintiff's parents.  The attorney summarized these as describing a person who

> cannot depend on functioning on any particular date, even medicated with psychotropic medication.  The hypothetical person has deep depressions; does not function well during those times.  Sleeps a great deal, slow to think or focus, overwhelmed with reality, uninterested in activities.  This can last three weeks to a month, or longer.  And we also ask you to assume that the individual has manic times where he's . . . hyperactive, doesn't sleep but a couple of hours a night, and is constantly in motion.

In response, the Ve testified that such an individual could not have "any reasonable opportunity to sustain work in any setting."

FINDINGS AND RECOMMENDATION - 22

Plaintiff's counsel also asked the VE to consider the effects of the limitations described by plaintiff's vocational rehabilitation counselor.  These included regular swings in mental health from confident and hopeful to severely depressed; bouts of depression that last from weeks to months; changes in appearance from "bright and attentive to looking exhausted, unsure, uninterested"; extreme tearfulness; lack of focus; and slow reactions. The VE testified that such an individual could not sustain full-time work.

Plaintiff's attorney also asked the VE to consider a person who needed the kinds of special academic accommodations, described above, that plaintiff received while attending a community college.  The VE responded that this description suggested "a pattern that would severely compromise a work setting in terms of either performance or attendance."

Plaintiff's counsel asked the VE to consider the limitations described by Dr. Shellman in October, 2001.  These included labile mood, impulsivity, heightened levels of activity accompanied by hostility and irritability, rapid and extreme mood changes, and 16 to 17 episodes of depression–lasting from 2 days to 3 weeks–within a 12-month period.  The VE testified that such an individual could not work in a "competitive economy."

Finally, plaintiff's attorney asked the VE to consider an individual with the limitations described in Dr. Veith's MMPI test finding.  The VE testified that an individual with these limitations "could not sustain employment–any employment."

ALJ's Decision

At step one of his most recent decision denying plaintiff's applications for benefits, the ALJ found that plaintiff had not engaged in substantial gainful activity since the alleged onset of his disability.

At step two, the ALJ found that plaintiff had "bipolar disorder versus major depression;" polysubstance dependence in reported remission since January, 2006; personality disorder, NOS; and obesity. He further concluded that these impairments were "severe" within the meaning of relevant regulations.

At step three, the ALJ found that plaintiff's severe impairments did not meet or equal any impairment in the "listings," 20 C.F.R. Pt. 404, Subpt. P, App. 1.

The ALJ found that plaintiff had the residual functional capacity needed to perform a limited range of light work. The ALJ found that plaintiff could lift and carry 20 pounds occasionally, and could carry 10 pounds frequently; could sit, stand, and walk for at least six hours out of any 8-hour workday; and could perform routine, repetitive work with little public contact. He added that plaintiff "would work best at tasks he can perform alone."

Based upon this assessment of plaintiff's residual functional capacity, at step four, the ALJ found that plaintiff could perform his past relevant work as an inspector. Accordingly, he found that plaintiff was not disabled within the meaning of the Social Security Act.

In finding that plaintiff was not disabled, the ALJ found that plaintiff, his parents, and other lay witnesses were not wholly credible.

<u>Standard of Review</u>

A claimant is disabled if he or she is unable "to engage in substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The initial burden of proof rests upon the claimant to establish his or her disability. <u>Roberts v. Shalala</u>, 66 F.3d 179, 182 (9th Cir. 1995), <u>cert.</u> <u>denied</u>, 517 U.S. 1122

(1996).  The Commissioner bears the burden of developing the record.  <u>DeLorme v. Sullivan</u>, 924 F.2d 841, 849 (9th Cir. 1991).

The district court must affirm the Commissioner's decision if it is based on proper legal standards and the findings are supported by substantial evidence in the record as a whole.  42 U.S.C. § 405(g); <u>see</u> <u>also</u> <u>Andrews v. Shalala</u>, 53 F.3d 1035, 1039 (9th Cir. 1995). "Substantial evidence means more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  <u>Andrews</u>, 53 F.3d at 1039.  The court must weigh all of the evidence, whether it supports or detracts from the Commissioner's decision.  <u>Martinez v. Heckler</u>, 807 F.2d 771, 772 (9th Cir. 1986).  The Commissioner's decision must be upheld, however, even if "the evidence is susceptible to more than one rational interpretation."  <u>Andrews</u>, 53 F.3d at 1039-40.

<u>Discussion</u>

Plaintiff contends that the ALJ made several critical errors in evaluating his applications for benefits.  He contends that the ALJ failed to include all of his restrictions in analyzing his residual functional capacity, posed a hypothetical to the VE that did not include all of his limitations, and erred in concluding that he could perform his past relevant work as an inspector.  Plaintiff also contends that the ALJ erred in finding that he and other lay witnesses were not wholly credible, and in rejecting medical opinions supporting the conclusion that he is disabled.

1. <u>Severity of Plaintiff's Mental Illness and Rejection of Medical Opinions</u>

FINDINGS AND RECOMMENDATION - 25

Plaintiff contends that the ALJ erred in finding that his mental impairment does not meet or equal a listed impairment.  He asserts that his bipolar disorder meets or equals Listing 12.04, Affective Disorders.

In support of this argument, plaintiff correctly notes that Dr. Powell, an examining psychologist, opined that he has bipolar disorder characterized by depressive symptoms that include anhedonia, appetite disturbance, sleep disturbance, decreased energy, feelings of guilt or worthlessness, difficulty concentrating or thinking, and thoughts of suicide and manic syndrome characterized by hyperactivity, decreased need for sleep, easy distractibility, and involvement in high risk activities.  He also notes that Dr. Powell opined that he had marked impairment in socialization, marked impairment in activities of daily living, moderate impairment in concentration, persistence, and pace, and a long history of episodes of decompensation, and opined that plaintiff's episodes of depression and related functional limitations would probably interfere with plaintiff's ability to maintain employment.

Dr. Powell's assessment, if accepted, is sufficient to establish that plaintiff's bipolar disorder meets or equals Listing 12.04, because it establishes impairments that meet the requirements of parts A, B, and C of that Listing.

Other medical opinion also supports the conclusion that plaintiff's mental impairments are more significant than the ALJ concluded, and are disabling.  Dr. Haydon, another examining psychologist, opined that plaintiff had significant learning disabilities and Attention Deficit Disorder, and had a GAF of 50.  Dr. Shellman, who was also an examining psychologist, opined that plaintiff had marked impairment in his activities of daily living, moderate impairment in attention and concentration, and had experienced more than four episodes of decompensation during the 12 months preceding his examination.  He rated

plaintiff's GAF at 45, and opined that an increase in mental demands would result in decompensation.  Dr. Shelby, yet another examining psychologist, rated plaintiff's GAF at 40, and opined that plaintiff might need to be hospitalized if his condition worsened.

In concluding that plaintiff's affective disorder did not meet or equal the listings, the ALJ discounted the opinions of Drs. Powell, Haydon, Shellman, and Shelby on the grounds that these opinions were inconsistent with plaintiff's success in community college, his ability to assume custody of his minor son, his non compliance with his medication regimen, and  Dr. Veith's assessment of "probable malingering."  Based upon a careful review of the record, I am satisfied that these reasons do not provide substantial evidence supporting the ALJ's analysis and conclusions.  Though plaintiff was able to satisfy the requirements of an Associate of Arts degree at a community college, he was able to do so only with numerous special accommodations provided through the college's disability services office.  Plaintiff was given 50% extra time to complete exams, received other assistance when taking exams, was given extra time to complete assignments, and received assistance from volunteer note takers.  Even with these accommodations, plaintiff was unable to sustain his attendance during many terms, was unable to take the usual number of courses, and needed more than twice the time normally required to complete the requirements of his program.  According to the uncontradicted testimony of the VE, a person with the limitations described by plaintiff's community college advisor would likely have significant work attendance problems and significant performance problems in a competitive work setting.  Under these circumstances, plaintiff's completion of a community college program does not provide substantial support for the ALJ's conclusions concerning the severity of plaintiff's impairments.

The ALJ's reliance on plaintiff's custody of his teenage son was also misplaced. The record, including the uncontradicted testimony of lay witnesses, establishes that plaintiff was able to care for his son only with significant assistance from his parents, and that plaintiff's parents sometimes cared for plaintiff's son for weeks at a time when plaintiff was unable to do so.

The ALJ's assertion that Dr. Veith's findings were more consistent with plaintiff's history and record as a whole than the findings of plaintiff's other treating and examining doctors is incorrect. The findings of the two examinations that Dr. Veith performed were not only inconsistent with the great weight of the evidence from other medical experts, but were inconsistent with each other. Dr. Veith concluded that his first examination produced a valid MMPI test, and opined that the results indicated chronic maladjustment, anger control and impulsivity problems, and problems relating to others. Though his second examination also produced a valid MMPI profile, Dr. Veith opined that the results of other parts of his testing suggested that plaintiff was malingering. Dr. Veith did not explain how the results of the second examination indicated malingering while the first examination did not, but instead referred to other scaling mechanisms outside the record. When plaintiff's former counsel asked for the underlying test data upon which his diagnosis of probable malingering were based, Dr. Veith refused to produce the material, and asserted that he had destroyed the underlying test data. Plaintiff correctly notes that destruction of that data was contrary to OAR 858-010-0060, which requires that a psychologist who renders services "billed to a third party payer" maintain "test results or other evaluative results obtained and any basic test data from which they were derived" for at least seven years.

Dr. Veith's finding that both of plaintiff's MMPI tests yielded valid results, his failure to preserve and provide underlying test data, and the absence of finding of malingering in any of the numerous other tests administered to plaintiff cast serious doubt on Dr. Veith's finding of probable malingering.  That finding was further undermined by the testing conducted by Dr. Powell shortly after Dr. Veith conducted his second examination.  Based upon repeated testing, Dr. Powell specifically concluded that plaintiff did not engage in any malingering type behavior patterns during his evaluation, but instead presented himself in an authentic manner and produced valid test results.  Dr. Powell noted that, of the many evaluations of plaintiff conducted by a number of examiners over a number of years, only the examination  performed by Dr. Veith in 2007 was construed as suggesting malingering behavior.  He also asserted that it appeared that Dr. Veith had based his opinion on a method of analysis that was no longer commonly used in assessing the validity of MMPI-2 testing, and opined that current standard indicators suggested a valid profile in both of the evaluations that Dr. Veith  conducted.

Even if it is contradicted by another doctor, the Commissioner must support the rejection of the opinion of an examining doctor by "specific and legitimate reasons that are supported by substantial evidence in the record."  Andrews v. Shalala, 53 F.3d 1035, 1043 (9th Cir. 1995). Here, the decision to reject the opinions of Dr. Powell and other examining and treating doctors as to the severity of plaintiff's impairments, and the decision to reject the findings of all doctors other than Dr. Veith as to the question of malingering, were not supported by such reasons or evidence. Given the numerous other examinations indicating valid results, the absence of any other evaluations suggesting malingering, Dr. Veith's improper destruction of underlying testing data, and the questions Dr. Powell  raised

FINDINGS AND RECOMMENDATION - 29

concerning Dr. Veith's diagnosis of malingering, the ALJ's reliance upon Dr. Veith's diagnosis of "malingering, probable" was misplaced.  That single result, which was starkly at odds with the results of many other tests, did not provide substantial support for the conclusion that plaintiff was a malingerer, or for the larger conclusion that plaintiff was not disabled.  Likewise, Dr. Powell's conclusion that plaintiff's affective disorder met listing 12.04 was consistent with the great weight of the evidence, and the ALJ's contrary conclusion was not based upon specific and legitimate reasons that were supported by substantial evidence in the record.  Rejection of the numerous opinions of medical experts supporting the conclusion that plaintiff was disabled, based largely upon plaintiff's care for his son, plaintiff's completion of a community college program, and an opinion of probable malingering not shared by any of the other treating or examining doctors, was in error.

Where, as here, the Commissioner fails to provide adequate reasons for rejecting the opinions of treating or examining doctors, those opinions are credited as a matter of law. Lester v. Chater, 81 F.3d 821, 834 (9th Cir. 1995).  A reviewing court then has discretion to remand for further administrative proceedings or for a finding of disability and an award of benefits.  See, e.g., Stone v. Heckler, 761 F.2d 530, 533 (9th Cir. 1985).  Whether an action is remanded for an award of benefits or for further proceedings depends on the likely utility of additional proceedings.  Harman v. Apfel, 211 F.3d 1172, 1179 (9th Cir. 2000).  A reviewing court should credit evidence and remand for a finding of disability and an award of benefits if: 1) the ALJ failed to provide legally sufficient reasons for rejecting the evidence; 2) there are no outstanding issues to be resolved before a determination of disability can be made; and 3) it is clear from the record that the ALJ would be required to find the claimant disabled

FINDINGS AND RECOMMENDATION - 30

if the evidence in question were credited.  Smolen v. Chater, 80 F.3d 1273, 1292 (9th Cir. 1996).

Under the guidance of these decisions, I recommend remanding this action for a finding of disability and an award of benefits.  The ALJ failed to provide legally sufficient reasons for rejecting the opinions of several treating and examining doctors concerning the severity of plaintiff's impairments.  There are no outstanding issues to be resolved before a determination of plaintiff's disability can be made, and an ALJ who credited the improperly rejected opinions would be required to find that plaintiff's illness meets the listing of 12.04.

2. Rejection of Lay Witness Statements

My conclusion that the ALJ improperly rejected medical evidence that would have required a finding that plaintiff is disabled makes it unnecessary to address the remainder of plaintiff's arguments.  Nevertheless, in order to create a complete record for any further review, I will briefly address the other issues plaintiff has raised.

In determining the severity of a claimant's limitations, an ALJ can use information from both medical and non-medical sources.  Schneider v. Commissioner, 223 F.3d 968, 975 (9th Cir. 2000).  Non-medical sources include "observations by people who 'have knowledge of the individual's functioning.' "  Id. (quoting 20 C.F.R. pt. 404, subpt. P, app. 1 § 12.00D).  These observations may be submitted in the form of written statements, and an ALJ must consider such statements if they are included in the record.  Id.  An ALJ who rejects the testimony of lay witnesses "must give reasons that are germane to each witness."  Dodrill v. Shalala, 12 F.3d 915 (9th Cir. 1993).

Plaintiff contends that the ALJ failed to provide germane reasons for rejecting the statements of plaintiff's parents, his vocational rehabilitation counselor, a friend, a treating psychiatric nurse practitioner, and a community college advisor.  I agree.  In his decision, the ALJ made no mention of, and provided no reasons for rejecting the statement provided by Alan Talbot, who reported that plaintiff had difficulty keeping his house clean, handling money, and getting along with others.  The ALJ mentioned, but provided no basis for rejecting, the statements of plaintiff's vocational rehabilitation counselor, who reported that plaintiff experienced many "bad days" that were "completely debilitating," and opined that plaintiff could not sustain even part-time competitive employment.

Plaintiff's treating nurse practitioner submitted a statement describing plaintiff's difficulty concentrating; low energy; poor motivation, judgment, and social skills; and impulsivity.  In addition, she stated that plaintiff's difficulty with taking prescribed medications was part of his illness, and opined that plaintiff's limitations would prevent him from working.  In rejecting these statements, the ALJ relied primarily on what he characterized the inconsistency of these statements with those of Dr. Arnold, an examining physician, and on assessments indicating that plaintiff had a GAF score of 50.  Given that the nurse practitioner's statements were wholly consistent with the opinions of four examining psychologists, and that a GAF score of 50 indicates "serious impairment," such as an inability to keep a job, the ALJ's reasons for rejecting these statements were not germane.

As noted above, written statements provided by plaintiff's parents described plaintiff as severely impaired.  In rejecting these statements, the ALJ cited plaintiff's ability to care for his son and to work part time, and the ability of plaintiff's mother to work despite her own bipolar disorder, which the ALJ suggested showed that a person who had bipolar disorder,

and took prescribed medication, could work.  These reasons are not germane.  The record

showed that plaintiff needed his parents'  help in order to care for his son, and plaintiff lost

his part-time work because of excessive absences.  The ability of plaintiff's mother to work

despite her bipolar disorder is not a legitimate basis for discounting her testimony concerning

her observation of plaintiff's conduct and limitations.


3. Adequacy of ALJ's Vocational Hypothetical

        In order to be accurate, an ALJ's hypothetical to a VE must set out all of the

claimant's impairments and limitations.  E.g., Gallant v. Heckler, 753 F.2d 1450, 1456 (9th

Cir. 1984) (citing Baugus v. Secretary of Health and Human Services, 717 F.2d 443, 447 (8th

Cir. 1983)).  The ALJ's depiction of the claimant's limitations must be "accurate, detailed,

and supported by the medical record."  Tackett v. Apfel, 180 F.3d 1094, 1101 (9th Cir. 1999).

If the assumptions included in an ALJ's hypothetical are not supported by the record, a VE's

conclusion that a claimant can work has no evidentiary value.  Embrey v. Bowen, 849 F.2d

418, 422 (9th Cir. 1988).

        Plaintiff contends that the ALJ's hypothetical to the VE describing his residual

functional capacity was deficient because it failed to include the marked limitations that

Dr. Powell and Dr. Shellman had described, failed to include the limitations described by

Dr. Veith in his discussion of plaintiff's 2004 MMPI test results, failed to include the

limitations described by plaintiff's treating nurse practitioner, and failed to include the

limitations described by numerous lay witnesses.   I agree.  For the reasons set out above,

the ALJ  erred in rejecting the opinions of several examining physicians, and in rejecting

without proper support the statements of numerous lay witnesses.  The VE's testimony that

plaintiff could perform his past relevant work was based upon a residual functional capacity assessment that failed to include all of plaintiff's limitations, and the VE testified that an individual with limitations that were improperly excluded could not perform any competitive employment.

Conclusion

A judgment should be entered REVERSING the Commissioner's decision denying plaintiff's applications for benefits and REMANDING this action to the agency for a finding of disability and an award of benefits.

Scheduling Order

The above Findings and Recommendation are referred to a United States District Judge for review.  Objections, if any, are due July 23, 2009.  If no objections are filed, review of the Findings and Recommendation will go under advisement on that date.

A party may respond to another party's objections within 10 days after service of a copy of the objection.  If objections are filed, review of the Findings and Recommendation will go under advisement upon receipt of the response, or the latest date for filing a response.

DATED this 7th day of  July, 2009.

/s/  John Jelderks
John Jelderks
U.S. Magistrate Judge

FINDINGS AND RECOMMENDATION - 34